**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALAN DALEWITZ, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>THE PROCTER & GAMBLE COMPANY, One Procter & Gamble Plaza, Cincinnati, OH 45201<br><br>Defendant. | Case No. 22-7323<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

## <u>PREAMBLE</u>

Plaintiff Alan Dalewitz ("Plaintiff" or "Dalewitz") individually and on behalf of himself and other similarly situated individuals, by and through his counsel, hereby files this Class Action Complaint for equitable relief and damages against Defendant The Procter & Gamble Company ("P&G" or "Defendant") regarding its false and deceptive marketing and sale of Oral-B Glide Dental Floss products (the "Products" or "Oral-B Glide"). Despite Defendant marketing the Products as "Pro-Health," the Products contain per- and polyfluoroalkyl substances ("PFAS"), which are a group of synthetic chemicals known to be harmful to human health and the environment, even at very low levels. Plaintiff Dalewitz alleges the following based upon information, belief, and the investigation of his counsel:

## <u>NATURE OF ACTION</u>

1.      Plaintiff brings this class action lawsuit on behalf of himself and similarly situated consumers ("Class Members") who purchased Defendant's Oral-B Glide "Pro-Health" Dental Floss Products, which are falsely advertised and unfit for their intended use because they contain unsafe and unhealthy PFAS. The Products are formulated, designed, manufactured, advertised,

1

distributed, and sold by Defendant or its agents to consumers, including Plaintiff, across the United States.

2.     PFAS are a group of synthetic chemicals known to be harmful to both the environment and humans. PFAS are released during the manufacture, use, and disposal of PFAS and PFAS-containing products.

3.     PFAS are readily absorbed into the body by various means, including by oral, dermal, and inhalation exposure. Because PFAS persist and accumulate over time, they are harmful even at very low levels. Indeed, PFAS have been shown to have numerous toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxic effects, and various cancers in epidemiology studies. The highest concentrations of PFAS are often found in the liver, kidneys, and blood.

4.     In fact, scientists are studying—and are extremely concerned about—how PFAS affect human health. Consequently, the Centers for Disease Control and Prevention ("CDC") outlined a host of health effects associated with PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of asthma and thyroid disease.

5.     Scientists are also increasingly concerned about how PFAS affect the environment, as PFAS contaminate water, air, fish, and soil, and have been linked to harmful effects in animals as well.

6.     Consumers are becoming increasingly concerned with the negative harms proliferated by manufacturers regarding the ingredients and/or materials used (including as to harmful chemicals that affect product safety) and the impact of those ingredients and/or materials on the environment.

7.      Through its marketing campaigns, Defendant has targeted consumers like Plaintiff who seek premium brands that prioritize consumer well-being and environmental protection. There are competing brands that offer similar products, but do not focus on capitalizing on these consumer preferences through their marketing.

8.      Defendant represents to consumers that it adheres to a "rigorous safety process to analyze every ingredient—before we ever consider putting it in one of our products."[1]

9.      Oral-B is a brand of dental hygiene products marketed to emphasize the importance of oral health. Oral-B Glide is a line of specific dental floss products, which has allowed P&G to become one of the biggest sellers of dental floss in the country.[2] P&G added the Oral-B brand to its "Pro-Health" line, which is "aimed at consumers willing to pay more for products that touted health benefits, as opposed to flavor or cosmetic appeal."[3]

10.      Additionally, P&G positions itself as a company dedicated to "helping ensure a healthy planet for present and future generations."[4]

11.      Despite the above representations made by Defendant to consumers regarding the health, safety, and sustainability of the Products, research has shown that these claims are false and misleading because the Products contain PFAS. As explained *infra*, the Products are primarily composed of a specific PFAS chemical and further testing confirms that the Products contain high levels of PFAS.

---

[1] *Product Safety*, P&G, https://us.pg.com/product-safety/ (last visited Nov. 13, 2023).
[2] Dominique Petruzzi, *Sales value of dental floss in the United States in 2019, by leading manufacturer (in million U.S. dollars)*, Statista (Feb. 2, 2022), https://www.statista.com/statistics/1072573/leading-dental-floss-vendors-sales-in-the-us/.
[3] Ellen Byron, *Merger Challenge: Unite Toothbrush, Toothpaste*, The Wall Street Journal (Apr. 24, 2007), https://www.wsj.com/articles/SB117737878770779935.
[4] *Mapping Our Impact*, P&G, https://us.pg.com/mapping-our-impact/ (last visited Nov. 13, 2023).

12.     Based on Defendant's representations, a reasonable consumer would expect that the Products can be safely used as marketed and sold. Due the presence of PFAS, however, the Products are not safe, posing a significant health risk to unsuspecting consumers.

13.     Nor are the Products sustainable, as PFAS-containing products are not responsibly sourced nor compostable. The forever chemicals contained in the Products will never break down, but rather persist and accumulate in the environment.

14.     Yet, neither before or at the time of purchase does Defendant notify consumers like Plaintiff that its Products are unsafe, contain heightened levels of PFAS, or should otherwise be used with caution.

15.     Accordingly, Plaintiff brings his claims against Defendant individually and on behalf of a class of all others similarly situated for (1) violations of the New York General Business Law § 349; (2) violation of the New York General Business Law § 350; and (3) fraudulent concealment.

## PARTIES

16.     Plaintiff Dalewitz is an individual consumer who is a currently a citizen of New City, New York.

17.     During the Class Period, Plaintiff Dalewitz purchased Oral-B Glide Products approximately every six months in multi-pack quantities at Costco Wholesale, located at 50 Overlook Blvd, Nanuet, NY 10954.

18.     Plaintiff Dalewitz, when he purchased the Products, saw and believed that the Products were healthy, based on the fact that the Products are a part of Defendant's "Pro-Health" line. The health representations of the Products were material to Plaintiff Dalewitz and encouraged him to make his purchases. Plaintiff Dalewitz relied upon these representations, which as a

consumer he had no reason to doubt. Plaintiff Dalewitz also believed P&G's environmental advertising.

19.     Plaintiff Dalewitz, along with other consumers, rely on representations when deciding which products to purchase.

20.     Plaintiff Dalewitz, along with other consumers, are willing to pay more for products that have benefits supposedly unique to that product.

21.     Plaintiff Dalewitz, along with other consumers, are injured when they pay a price premium based on false or misleading representations.

22.     Plaintiff Dalewitz would not have purchased the Products or would not have purchased them on the same terms, if he had known that contrary to P&G's representations, the Products contain PFAS, a group of dangerous and unsustainable chemicals.

23.     Defendant P&G is the "the world's largest consumer goods company."[5]

24.     P&G has owned the Oral-B brand for almost 20 years.[6]

25.     As a direct result of P&G's material misrepresentations and omissions, Plaintiff Dalewitz suffered, and continues to suffer, economic injuries.

26.     On April 28, 2022, Plaintiff Dalewitz sent Defendant P&G a letter about the allegations set forth in this Complaint. Defendant responded but the issue has not been resolved.

27.     Accordingly, Plaintiff Dalewitz, on behalf of himself and all other members of the Class, seeks relief, including punitive damages, due to Defendant's acts and practices.

---

[5] *About Us*, P&G, https://www.pgcareers.com/global/en/about-us (last visited Nov. 13, 2023).
[6] Byron, *supra* note 3.

# FACT ALLEGATIONS

## I. Background on PFAS.

28.     Despite Defendant's representations regarding health and environmental sustainability, P&G knows that Oral-B Glide is made with PFAS, a chemical family that causes health issues in humans and is environmentally unsustainable.

29.     Back in 1992, before being sold under the Oral-B brand, the Products were sold as "Glide" and were owned by W.L. Gore & Associates ("Gore").[7]

30.     Glide floss, as stated by Gore, is made of "commercially available expanded PTFE."[8] In 2003, when P&G first announced it was acquiring Glide from Gore, the plan was for "Gore [to] continue to make Glide" while P&G "handle[d] the product's packaging and marketing."[9]

31.     At some point after also acquiring the Oral-B brand from Gillette, P&G rebranded Glide as an Oral-B product and sold it under its "Pro-Health" line.[10]

32.     Today, the Products are still made with ePTFE.[11]

---

[7] Sarah Ellison, *Procter & Gamble To Buy Glide Floss,* The Wall Street Journal (Sept. 17, 2003), https://www.wsj.com/articles/SB10637558338169300.

[8] *Hereinafter* known as ePTFE. *See* U.S. Patent No. 5,518,012 (filed May 21, 1996).

[9] Ellison, *supra* note 7.

[10] Byron, *supra* note 3.

[11] *See, e.g.* Leonard Lorch, *Radically Easier Dental Floss That Freshens Breath Patented*, Cision (Feb. 20, 2019), https://www.prnewswire.com/news-releases/radically-easier-dental-floss-that-freshens-breath-patented-300799090.html ("Many readers will recognize ePTFE flosses glide between teeth because that's what Procter & Gamble's leading ORAL-B GLIDE flosses do that are so popular nowadays."); Olivia Abel, *The best dental floss*, Insider (Apr. 23, 2018), https://www.insider.com/guides/beauty/best-dental-floss ("[Oral-B Glide] is made with polytetrafluorethylene, or PTFE, a man-made chemical also used in Gore-Tex and Teflon products.").

33.     Expanded polytetrafluoroethylene, or ePTFE, is a type of PTFE.[12] PTFE is "best known by the brand name Teflon™ [and] is typically made using several hazardous PFAS (per- and polyfluorinated alkyl substances) that have polluted drinking water across the globe."[13]

34.     By way of background, the PFAS family of chemicals was accidentally discovered in 1938 by a scientist working at E.I. du Pont de Nemours and Company ("DuPont"). In the decades following that discovery, DuPont and The 3M Company ("3M") became the primary manufacturers of PFAS. For decades, DuPont, 3M, and other manufacturers were aware that PFAS persist indefinitely in the environment, bioaccumulate in blood, and pose a substantial threat to human health and the environment.

35.     The manufacturers concealed and downplayed the threat to human health and the environment presented by PFAS. They withheld data and research regarding the toxicity of PFAS from the public and from regulators. Regulators continue to play catch-up in addressing the threat to human health and the environment presented by PFAS because DuPont and other manufacturers concealed the dangers associated with these substances.

36.     Documents uncovered in lawsuits against PFAS manufacturers revealed that these companies had "preliminary evidence of PFAS toxicity as early as the 1960s."[14] In 1981, for instance, DuPont removed women workers from its PFAS production lines after "eight recently

---

[12] *Materials Science Innovation*, Gore, https://www.gore.com/about/technologies (last visited Nov. 13, 2023).

[13] *Undisclosed PFAS coatings common on cookware, research shows*, Ecology Center, https://www.ecocenter.org/our-work/healthy-stuff-lab/reports/whats-cooking/undisclosed-pfas-coatings-common (last visited Nov. 13, 2023).

[14] Jeffrey Kluger, *Companies Knew the Dangers of PFAS 'Forever Chemicals'—and Kept Them Secret*, Time (June 1, 2023), https://time.com/6284266/pfas-forever-chemicals-manufacturers-kept-secret/. This article also notes that even PFAS manufacturers agree that "[t]he higher the level of fluorine, the higher the level of PFAS, and the greater the risk of all of the illnesses associated with the chemicals." Further, this article highlights the "[p]ublic demand is leading to a growing market for PFAS-free products."

pregnant coworkers" gave birth to babies with birth defects, including one who had two PFAS chemicals "in [their] cord blood."[15]

37.     Though much of the toxicological research to date has focused on certain types of PFAS, DuPont and other manufacturers themselves state that the entire PFAS family of chemicals, not just specific types, are "hazardous substances."[16]

38.     Today, the PFAS chemical family contains more than 9,000 highly fluorinated aliphatic compounds–all manufactured by humans and known to be damaging to both human health and the environment,[17] even at very low levels.[18]

39.     PFAS are considered "forever chemicals" because they do not biodegrade or break down naturally in the environment.[19] Use of PFAS in the manufacturing of dental floss and other products leads to the accumulation of PFAS in soil, water, humans, and elsewhere in the environment, threatening other organisms.[20] For example, a study by the U.S. Environmental

---

[15] *Id.*

[16] *N.J. Dep't. of Env't. Protection, et al. v. E. I. du Pont de Nemours and Co., et al.*, 2:19-cv-14758, ECF No. 118 at 12.

[17] *Nat'l Inst. of Envtl. Health Sciences, Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS)*, Nat'l Insts. of Health U.S. Dep't. of Health and Human Servs. ("NIH"), https://www.niehs.nih.gov/health/topics/agents/pfc/index.cfm (last visited Nov. 13, 2022); Elsie M. Sunderland, et al., *A review of the pathways of human exposure to poly- and perfluoroalkyl substances (PFASs) and present understanding of health effects*, 29 J. Expo. Sci. Envtl. Epidemiol., 131-47 (2019), DOI: 10.1038/s41370-018-0094-1.

[18] *See* Abrahm Lustgarten, et al., *Suppressed Study: The EPA Underestimated Dangers of Widespread Chemicals*, ProPublica (June 20, 2018), https://www.propublica.org/article/suppressed-study-the-epa-underestimated-dangers-of-widespread-chemicals; *see also* Linda S. Birnbaum, *The Perils of PFAS*, Gillings School of Public Health, UNC, (Feb. 12, 2021), https://sph.unc.edu/wp-content/uploads/sites/112/2019/08/The-Perils-of-PFAS-UNC-Final-2.12.21.pdf.

[19] As an illustration of how "forever" PFAS compounds are, in 1997, when a PFAS manufacturer sought "clean blood samples" to compare to PFAS-tainted samples, the only source of "clean blood" (free of PFAS contamination) was the "preserved blood of soldiers who died in the Korean War, before [PFAS] products spread worldwide." *Poisoned Legacy*, Environ. Working Group (May 1, 2015), https://www.ewg.org/research/poisoned-legacy.

[20] NIH, *supra* note 17; Francisca Pérez, et al., *Accumulation of perfluoroalkyl substances in human tissues*, 59 Env't. Int'l 354 (2013).

Protection Agency ("EPA") on freshwater fish contamination found significant levels of PFAS in nearly every fish sampled.[21]

40.     Consumers have grown increasingly aware of and concerned about PFAS and the presence of such in their bodies, the environment, and the products they use.[22]

41.     As a result, there is a growing consumer advocacy movement to eliminate PFAS from various consumer products, including dental floss.[23]

42.     In fact, on October 18, 2021, underscoring the gravity of the PFAS threat, the Biden-Harris Administration announced accelerated efforts to protect Americans from PFAS, which can cause "severe health problems" and persist in the environment once released, "pos[ing] a serious threat across rural, suburban, and urban areas."[24]

43.     PTFE specifically is known to be a major environmental pollutant. While early studies suggested PTFE may be safe for certain uses, that conclusion has increasingly been called into question, especially considering that it is known that its manufacturing process necessarily involves the use of PFAS chemicals that are harmful to human health.[25]

44.     For instance, PTFE used to be manufactured with PFOA, a particularly dangerous PFAS chemical, but was then reformulated with Gen X, the name for the PFAS chemical

---

[21] Nadia Barbo, et al., *Locally caught freshwater fish across the United States are likely a significant source of exposure to PFOS and other perfluorinated compounds*, 220 Envtl. Research 115165 (2023), https://doi.org/10.1016/j.envres.2022.115165.

[22] LastWeekTonight, *PFAS: Last Week Tonight with John Oliver (HBO)*, YouTube (Oct. 4, 2021), https://www.youtube.com/watch?v=9W74aeuqsiU.

[23] Elicia Mayuri Cousins, et al., *Risky Business? Manufacturer and Retailer Action to Remove Per- and Polyfluorinated Chemicals from Consumer Products*, NEW SOLUTIONS: A J. of Envtl. & Occupational Health Policy (2019) 29(2), 242–65, DOI: 10.1177/1048291119852674.

[24] *FACT SHEET: Biden-Harris Administration Launches Plan to Combat PFAS Pollution*, The White House (Oct. 18, 2021), https://bit.ly/3DZvZba.

[25] *The Teflon chemical PTFE is often touted as a safe cousin of toxic PFAS. But is it really?*, ChemSec (Feb. 10, 2022), https://chemsec.org/the-teflon-chemical-ptfe-is-often-touted-as-a-safe-cousin-of-toxic-pfas-but-is-it-really/#close.

formulated sometime post-2009 that also bears a "substantial risk of injury to health or the environment."[26]

45.     Thus, P&G's advertising of Oral-B Products—which suggests that the Products are "Pro-Health"—is false and misleading.[27]

46.     P&G's representations that it is a sustainable company despite its use of PFAS as an ingredient in the Products is also false and misleading.

47.     P&G also deceives consumers by concealing the material fact that the Products contain PFAS, which a reasonable consumer would not assume.

48.     By deceiving consumers about the nature of the Product, P&G is able to sell a greater volume of the Products, to charge higher prices for the Products, and to take market share away from competing products, thereby increasing its own sales and profits.

49.     P&G's "Pro-Health" line tends to be more expensive than competing brands.[28]

Oral B
**Oral-B Glide Pro-Health Original Dental Floss - 54.6 yd**

★★★★⯪     4.5 (170)

**$4.99**

---

[26] Sharon Lerner, *New Teflon Toxin Causes Cancer In Lab Animals*, The Intercept (March 3, 2016), https://theintercept.com/2016/03/03/new-teflon-toxin-causes-cancer-in-lab-animals/.

[27] P&G also describes the Products as being covered with a "[l]ight coating of **natural** wax for improved grip," which further obscures the fact that there are dangerous **synthetic** chemicals in the Product. *Glide Pro-Health Advanced Floss*, Oral-B, https://oralb.com/en-us/products/more-products/floss/glide-pro-health-advanced-floss/ (last visited Nov. 13, 2023).

[28] *Compare Oral-B Glide Pro-Health Original Dental Floss – 54.6 yd*, Rite Aid, https://www.riteaid.com/shop/oral-b-glide-pro-health-floss-original-1-roll-0038525 (last visited Nov. 13, 2023) *to Reach Waxed Dental Floss, Mint – 200 Yards*, Rite Aid, https://www.riteaid.com/shop/reach-floss-mint-waxed-1-roll-0316037 (last visited Nov. 13, 2023). (Reach dental floss is an Oral-B Glide competitor. *See* Ellison, *supra* note 7.)

Reach
**Reach Waxed Dental Floss, Mint - 200 Yards**

★★★★★ 4.8 (23)

**$4.29**

50. Because P&G's marketing of the Products tends to mislead and is materially deceptive about the true nature and quality of the Products, Plaintiff Dalewitz brings this case on behalf of himself and all others similarly situated and seeks equitable and monetary relief.

**II. P&G Sells the Products as a Part of Its "Pro-Health" Marketing Campaign.**

51. P&G specifically markets the Oral-B Glide Products as being "Pro-Health."[29]

52. Plaintiff Dalewitz purchased Oral-B Glide's Advanced Multi-Protection Floss, which is a part of P&G's "Pro-Health" product line. Below are generic images[30] that reflect the packaging of the Product purchased by Dalewitz:



---

[29] Byron, *supra* note 3.
[30] Captured from *Oral B Glide Pro-Health Advanced Multi Protection Clean Mint Floss 6-43.7 yd. Packs,* Walmart, https://www.walmart.com/ip/Oral-B-Glide-Pro-Health-Advanced-Multi-Protection-Clean-Mint-Floss-6-43-7-yd-Packs/323591591 (last visited Nov. 13, 2023).



53.      Defendant's representations are designed to lead, and do lead, consumers to believe that Oral-B Glide Products are made in a way that will benefit consumers' health or otherwise be safe to use.

54.      In fact, "Pro-Health" is specifically a line by P&G "aimed at consumers willing to pay more for products that touted *health benefits*...."[31]

55.      The Products, though, contain PTFE, a type of PFAS.

56.      Upon information and belief, other types of PFAS are also present in the Products. *See infra* ¶¶ 74, 97.

57.      Even if PTFE is the only PFAS contained in the Product, **PFAS manufacturers have stated that all PFAS are "hazardous."** *See supra* ¶ 37.

---

[31] Byron, *supra* note 3 (emphasis added).

58. Additionally, other unsafe PFAS are required for the production of PTFE.

59. Consumers who rely on and pay more for the Products' "Pro-Health" representation are thus deceived by the fact that the Products contain PFAS, which have detrimental effects on human health.

**A. Health Representations Are Material to Consumers.**

60. Consumers care about whether the products they use contain toxic or harmful chemicals.

61. In fact, "48% of global consumers say they make proactive health and wellness choices on a regular basis."[32]

62. Other surveys on consumer habits have found that "consumers are considering health and fitness to be [] 'essential.'"[33]

63. Finally, "[a]t least 70 percent of the survey respondents across the markets surveyed want to be healthier."[34]

64. Consumers seeking safe and healthy products would not consider "Pro-Health" dental floss–an oral hygiene product–safe nor healthy if they knew they were being exposed to PFAS.

**III. P&G Sells the Products as a Part of Its Sustainability Marketing Campaign.**

65. P&G also makes environmental representations. *See supra* ¶ 10.

---

[32] *An inside look into the global consumer health and wellness revolution*, NielsenIQ, https://nielseniq.com/global/en/insights/report/2021/an-inside-look-into-the-2021-global-consumer-health-and-wellness-revolution/ (last visited Nov. 13, 2023).

[33] *Consumers See Health and Well-being as "Essential" Spend Category, Accenture Survey Finds*, Accenture, (Sept. 7, 2022), https://newsroom.accenture.com/news/consumers-see-health-and-well-being-as-essential-spend-category-accenture-survey-finds.htm.

[34] Anne Grimmelt, et al., *Hungry and confused: The winding road to conscious eating*, McKinsey & Co. (Oct. 5, 2022), https://www.mckinsey.com/industries/consumer-packaged-goods/our-insights/hungry-and-confused-the-winding-road-to-conscious-eating.

66.     P&G represents that "environmental sustainability is embedded in how we do business."[35]

67.     P&G claims that its sustainability plans are "built upon the strength of four science-based pillars—Climate, Waste, Water and Nature."[36]



**A. Environmental Representations Are Material to Consumers.**

68.     P&G knows that consumers, such as Plaintiff Dalewitz, seek out and are willing to pay more for brands that are environmentally sustainable. PFAS, of course, are unsustainable.

69.     "Sustainability ranks high as a consumer goal in the United States (64 percent)."[37]

70.     Also, "68% [of Americans] would pay more for sustainable products."[38]

---

[35] *Environmental Sustainability*, P&G, https://us.pg.com/environmental-sustainability/ (last visited Nov. 13, 2023).

[36] *Id.*

[37] Grimmelt, *et al.*, *supra* note 34.

[38] Computer Generated Solutions Inc., *Interest in Sustainability Surges for Consumer Products*, https://www.cgsinc.com/en/resources/interest-sustainability-surges-consumer-products (last visited Nov. 13, 2023).

71.     In fact, environmental, social, and governance ("ESG") claims, such as sustainability, have an outsized importance to consumers.[39]

72.     Further, the Federal Trade Commission ("FTC") has released "Green Guides" that caution marketers not to make unqualified general environmental benefit claims because "it is highly unlikely that marketers can substantiate all reasonable interpretations of these claims."[40]

## IV.     The Products Are Made With PFAS, a Chemical Family That Causes a Multitude of Health Problems.

73.     Publicly available sources confirm that the Products are made with PFAS.[41]

74.     Additionally, P&G mentions the use of PTFE and Teflon™ on its website.[42]

## Dental Floss Today

Since then, the variety of types of dental floss has expanded to include newer materials such as Gore-Tex, and different textures such as spongy floss and soft floss. And today's floss has other features to make flossing easier. For example, floss with stiffened ends is designed to help with flossing around braces or other dental appliances.

## Water Flosser vs. String Floss

Flossing involves threading a thin string of nylon or Teflon between teeth in a C-shape pattern to remove plaque. A water flosser, also known as an oral irrigator, works by shooting out a thin, pressurized stream of water between teeth. Some may find a water flosser is easier to use than traditional floss. It's much less hands on, and less technique intensive. The Oral-B Water Flosser Advanced Cordless Irrigator is designed to deep clean and detoxify* below the gum line. Its unique Oxyjet Technology targets and helps eliminate plaque bacteria for healthier gums.

---

    [39] *Consumers care about sustainability—and back it up with their wallets*, McKinsey & Co. (Feb. 6, 2023), https://www.mckinsey.com/industries/consumer-packaged-goods/our-insights/consumers-care-about-sustainability-and-back-it-up-with-their.wallets. ("[P]roducts making ESG-related claims generated outsize growth [] in three out of four personal-care categories[.]").
    [40] FTC Green Guides, 16 C.F.R. § 260.4(b) (2012).
    [41] *See supra* note 11.
    [42] *The History of Dental Floss*, Oral-B, https://oralb.com/en-us/oral-health/dental-floss-history/ (Gore-Tex is ePTFE) (last visited Nov. 13, 2022); *Dental Floss Types—The Pros and Cons*, Oral-B, https://oralb.com/en-us/oral-health/why-oral-b/floss/dental-floss-types-the-pros-and-cons/ (last visited Nov. 13, 2022); *Water Flossers vs. String Floss*, Oral-B, https://oralb.com/en-us/oral-health/why-oral-b/floss/water-flossers-vs-string-floss (last visited Nov. 13, 2022).

## Types of Dental Floss

The choices for a product as basic as  dental floss can seem overwhelming, but you can't go wrong with a choice of floss as long as you use it every day.

Each type of dental floss has pros and cons. Here are a few points to keep in mind about your flossing options:

- **Unwaxed floss** is thin nylon floss made of about 35 strands twisted together. It fits into tight spaces if your teeth are close together, but it can be prone to shredding or breaking.
- **Waxed floss** is a standard nylon floss with a light wax coating. It is less likely to break, but the wax coating may make it harder to use in tight spots.
- **Dental tape** is broader and flatter than standard floss and comes in waxed or unwaxed versions. People with more space between their teeth often find dental tape more comfortable to use than standard floss.
- **Polytetrafluorethylene floss (PTFE)** is the same material used in high-tech Gore-Tex fabric. The material slides between the teeth easily and is less likely to shred compared to standard floss.
- **Super flosses** are made from yarn-like material that has stiffer sections on each end that can be used to clean around braces or dental bridges.

75.     Also, Plaintiff Dalewitz facilitated his own testing which ***further confirms*** that the Products are made with PFAS:

- **Product Tested:** Oral-B Glide Advanced Multi-Protection Floss, Clean Mint

- **Test Period:** May 2022

- **Laboratory:** Galbraith Laboratories, Inc., located in Knoxville, Tennessee.

- **Methodology:** Total Organic Fluorine ("TOF") testing

76.     The results of Plaintiff Dalewitz's test was that the sample contained 302,400 parts per million ("ppm") of organofluorine, also known as organic fluorine, a level that is more than **3000 times** the 100 ppm of organic fluorine that is widely accepted as being indicative of intentional use of PFAS.

77.     Organic fluorine results identify a quantity of organofluorine compounds (*e.g.*, PFAS) and exclude the possibility that fluorine may be present from other or natural sources.[43]

---

[43] Lara Schultes**,** et al., *Total Fluorine Measurements in Food Packaging: How Do Current Methods Perform?*, 6(2) Envtl. Sci. Tech. Letters 73 (2019).

78.     "Since the world hasn't found a way to test which of 9,000 PFAS are in products, the best current test methods [for PFAS] look for fluorine."[44] "[W]hen measuring organofluorine in the environment one can assume that it originates from an anthropogenic source."[45]

79.     All PFAS are anthropogenic, or in other words, man-made.[46]

80.     Experts in PFAS chemicals agree that the presence of organic fluorine is a reliable proxy for the presence of PFAS in a product.[47]

81.     The Cancer Free Economy Network supports this conclusion, declaring "there are few standardized PFAS test methods."[48] Accordingly, researchers may rely on "total fluorine tests [which] are indirect methods designed to measure a representative element indicative of PFAS."[49]

82.     Rainer Lohmann, Director of University of Rhode Island's Lohmann Lab, supports these conclusions, stating that "[i]f a product is showing really high fluorine levels, companies really can't claim they didn't use PFAS."[50]

---

[44] Jessian Choy, *New Independent Study Confirms PFAS in Thinx, Other Products*, Sierra Club (June 3, 2021), https://www.sierraclub.org/sierra/ask-ms-green/new-independent-study-confirms-pfas-thinx-other-products.

[45] Alina Koch, et al., *Towards a comprehensive analytical workflow for the chemical Characterisation of organofluorine in consumer products and environmental samples*, 123 TrAC Trends in Analytical Chemistry 115423 (2020) ("[N]o single analytical method is versatile and robust enough to identify and quantify the vast number of PFASs, as well as other fluorine-containing agrochemicals or pharmaceuticals that might be present in a sample.").

[46] *What are PFAS?*, Agency for Toxic Substances and Disease Registry, https://www.atsdr.cdc.gov/pfas/health-effects/overview.html (last visited Nov. 13, 2023).

[47] *See, e.g.*, Heather D. Whitehead, et al., *Fluorinated Compounds in North American Cosmetics*, 8(7) Envtl. Sci. Tech. Letters 538–544 (2021), https://doi.org/10.1021/acs.estlett.1c00240. (PFAS concentrations were detected by screening for total fluorine); *Testing for PFAS in food packaging*, Supply Chains Solutions Center, https://supplychain.edf.org/resources/testing-for-pfas-in-food-packaging/ (last visited Nov. 13, 2023) (recommending that companies screen for PFAS "using a total fluorine method . . . [that] measures all forms of PFAS"); Kevin Loria, *Dangerous PFAS Chemicals Are in Your Food Packaging*, Consumer Reports (March 24, 2022), https://www.consumerreports.org/pfas-food-packaging/dangerous-pfas-chemicals-are-in-your-food-packaging-a3786252074/ ("CR tested products for their total organic fluorine content, which is considered the simplest way to assess a material's total PFAS content. That's because all PFAS contain organic fluorine, and there are few other sources of the compound, says Graham Peaslee, PhD, a professor of physics, chemistry, and biochemistry at the University of Notre Dame in Indiana, who has studied PFAS in food packaging.").

[48] Cancer Free Economy Network, *A Short Guide To Common Testing Methods For Per- And Polyfluoroalkyl Substances* (PFAS) 1 (2020), https://www.bizngo.org/images/ee_images/uploads/resources/CFE_PFAS_Testing_FactSheet_Final.pdf.

[49] *Id.*

[50] Jackie Salo, *Chipotle, Sweetgreen bowls are linked to cancer-causing chemicals*, NY Post (Aug. 7, 2019), https://nypost.com/2019/08/07/chipotle-sweetgreen-bowls-are-linked-to-cancer-causing-chemicals/.

83. The fact that the TOF test results are well over the 100 ppm threshold is also notable since even state governments use this threshold as a basis to regulate PFAS in consumer products.[51]

84. In addition, federal courts have recognized TOF testing as a legitimate way to determine that a product contains PFAS.[52]

85. While Plaintiff Dalewitz's TOF confirms the presence of PFAS in the Products, as previously mentioned, *supra* ¶ 32, Defendant admits that ePTFE, a type of PFAS, is one of the ingredients in the Products.

86. While only P&G knows how many other PFAS chemicals are contained within the Products, Gen X, a subgroup of PFAS chemicals, are surfactants "necessary for making PTFE."[53]

87. As such, upon information and belief, the Products contain Gen X chemicals as they are an essential component for the manufacturing of the Products' main ingredient.

## A. Consumers Do Not Expect Products That Are Supposed to Provide Health Benefits to Contain Chemicals Harmful to Human Health.

88. PFAS are objectively not "Pro-Health."

89. Research into PFAS has been plagued by corporate secrecy, and new information about the dangers of these substances is revealed with alarming regularity.[54]

90. As mentioned, *supra* ¶ 37, even the manufacturers of PFAS agree that the entire chemical family is "hazardous."

---

[51] *See, e.g.* Cal. Health & Safety Code Div. 104, Pt. 3, Ch. 15, Art. 1, § 109000 ("The presence of PFAS in a product or product component at or above 100 parts per million, as measured in total organic fluorine.").

[52] *See Hamman v. Cava Grp., Inc.*, No. 22-cv-593-MMA, 2023 U.S. Dist. LEXIS 85634, *12 (S.D. Cal.) (denying motion to dismiss claim that product contained PFAS based on organic fluorine testing).

[53] *Supply chains of nonstick PTFE pan coatings: Case studies*, Ecology Center, https://www.ecocenter.org/our-work/healthy-stuff-lab/reports/whats-cooking/supply-chains-nonstick-ptfe-pan-coatings-case-studies (last visited Nov. 13, 2023).

[54] *See, e.g., Hardwick v. 3M Co.*, 589 F. Supp. 3d 832, 840, 869 (S.D. Ohio 2022) (certifying class in case where plaintiff alleged that PFAS manufacturer "engaged in a systematic effort to conceal and deny the dangers of PFAS"); *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, MDL No. 2:18-mn-2873, 2022 U.S. Dist. LEXIS 168634, at *33, 48 (D.S.C. Sept. 16, 2022) (denying defendant PFAS manufacturer's summary judgment motion in matter concerning non-disclosure of "health and environmental effects of" certain types of PFAS).

91. The EPA currently advises the public about the health threats presented by the PFAS family as a whole: "peer-reviewed scientific studies have shown that exposure to certain levels of PFAS may lead to:

> Reproductive effects such as decreased fertility or increased high blood pressure in pregnant women.
>
> Developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes.
>
> Increased risk of some cancers, including prostate, kidney, and testicular cancers.
>
> Reduced ability of the body's immune system to fight infections, including reduced vaccine response.
>
> Interference with the body's natural hormones.
>
> Increased cholesterol levels and/or risk of obesity."[55]

92. In light of these health concerns, multiple states have enacted regulations regarding PFAS in consumer products.[56]

93. Moreover, the following figure from the European Environment Agency ("EEA") shows the "[e]ffects of PFAS on human health:"[57]

---

[55] *Our Current Understanding of the Human Health and Environmental Risks of PFAS*, EPA, https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (last visited Nov. 13, 2023.)

[56] *See, e.g., supra* note 51; *see also* Me. Rev. Stat. Tit. 38 § 1614; Victor Y. Xu, *Minnesota and Washington Blitz PFAS in Products; Maine Backpedals*, Marten Law, (June 15, 2023), https://www.martenlaw.com/news-and-insights/minnesota-and-washington-blitz-pfas-in-products-maine-backpedals#_ftnref11; *PFAS in Apparel Law*, N.Y.S. Dep't of Envtl. Conservation, https://www.dec.ny.gov/chemical/128082.html (last visited Nov. 13, 2023).

[57] *Emerging Chemical Risks in Europe – 'PFAS,'* European Environment Agency, (Dec. 12, 2019), https://www.eea.europa.eu/publications/emerging-chemical-risks-in-europe.



**Figure 1. Effects of PFAS on human health**

—— High certainty

----- Lower certainty

Developmental effects
affecting the unborn child

Thyroid disease

Increased cholesterol levels

Delayed mammary gland development

Breast cancer

Reduced response to vaccines

Liver damage

Lower birth weight

Kidney cancer

Obesity

Early puberty onset

Inflammatory bowel disease
(ulcerative colitis)

Increased miscarriage risk
(i.e. pregnancy loss)

Testicular cancer

Low sperm count and mobility

Increased time to pregnancy

Pregnancy induced
hypertension/pre-eclampsia
(increased blood pressure)

94.    Aforementioned, *supra* ¶ 86, the one confirmed PFAS chemical in the Products, PTFE, now requires the use of the Gen X group of PFAS chemicals.

95.    Gen X chemicals have been in existence for approximately 14 years.[58] They are a new kind of PFAS with a shorter chain of carbon atoms.[59] Ironically, they were made to replace dangerous long-chain PFAS.[60]

96.    Unfortunately, like the previous generation of PFAS chemicals, Gen X poses the same toxicity concerns.[61] In fact, in 2022 the EPA released a drinking water health advisory for

---

[58] Sharon Lerner, *Chemours Claims Toxic PFAS Chemical GenX Protects The Climate,* The Intercept (Apr. 11 2022), https://theintercept.com/2022/04/11/pfas-genx-chemours-climate-crisis/.

[59] PFAS with six carbon atoms are known as "short-chain," whereas those with eight are called "long-chain."

[60] Lerner, *supra* note 58.

[61] *Id.* ("[A]dditional research [handed over] to the EPA [] showed that the toxicity profile of [Gen X] in fact did match that of [older PFAS].").

Gen X, based upon animal toxicity studies that link Gen X with "health effects on the liver, the kidney, the immune system, and developmental effects, as well as cancer."[62]

97.     Even worse, the Products are oral hygiene products, so consumers are directly exposed to the Products' ingredients. As explained, *infra* § V, PFAS are mobile chemicals, dental floss such as Oral-B Glide sheds, and ingestion is a main pathway to exposure in humans.

98.     In fact, in 2019, a peer-reviewed study (the "Boronow Study") identified two specific PFAS chemicals—PTFE and PFHxS—as being associated with Oral-B Glide products.[63]

99.     PFHxS is a bioaccumulative PFAS chemical that "can cause adverse health effects, including harmful effects to a developing fetus, the thyroid, and the liver."[64]

100.    As a result of this study, consumers became concerned by the presence of PFAS in Oral-B Glide Products, as evidenced by publicly posted questions consumers asked about the contents of the Products.[65]

[62] *Questions and Answers: Drinking Water Health Advisories for PFOA, PFOS, GenX Chemicals and PFBS*, EPA, https://www.epa.gov/sdwa/questions-and-answers-drinking-water-health-advisories-pfoa-pfos-genx-chemicals-and-pfbs (last visited Nov. 13, 2023).

[63] K.E. Boronow, et al., *Serum concentrations of PFASs and exposure-related behaviors in African American and non-Hispanic white women*, 29 J. Expo. Sci. Envtl. Epidemiol. 206-17 (2019). DOI: 10.1038/s41370-018-0109-y.

[64] *Notification Level Recommendation for Perfluorohexane Sulfonic Acid (PFHxS) in Drinking Water*, OEHHA (Mar. 17, 2022), https://oehha.ca.gov/water/report/notification-level-recommendation-perfluorohexane-sulfonic-acid-pfhxs-drinking-water.

[65] *See, e.g. Oral-B Glide Pro-Health Deep Clean Dental Floss Cool Mint*, Target, https://www.target.com/p/oral-b-glide-pro-health-deep-clean-dental-floss-cool-mint-2pk/-/A-13508348?preselect=13508348#lnk=sametab (last visited Nov. 13, 2023).



101.    Consumers thus do not expect chemicals linked to severe and varied health problems in a "Pro-Health" product. Nor would consumers pay more for "Pro-Health" products containing toxic chemicals such as PFAS.

102.    In fact, Plaintiff Dalewitz conducted his own survey, in which 95.1% of respondents said that the presence of PFAS in dental floss would be either important or very important to their purchasing decisions.

## V.    The Products Contain PFAS, a Chemical Family That Is Harmful to the Environment.

103.    As explained, *supra*, the Products contain PFAS.

104.    Despite P&G's environmental claims, PFAS are environmentally unsustainable.

105.    PFAS are non-biodegradable "forever chemicals," which accumulate in the environment and thus are unsustainable, as shown in this diagram.[66]

---

[66] *PFAS 101: What are Polyfluoroalkyl Substances & What Do They Have To Do With Packaging?,* Source Green, https://www.sourcegreenpackaging.com/pfas-101-polyfluoroalkyl-forever-chemicals/ (last visited Nov. 13, 2023).



106. The production of PTFE, in particular, has wreaked environmental havoc because the manufacturing of PTFE requires the use of other PFAS.[67] Some examples of the environmental damage caused by PTFE production include:[68]

- A Teflon™ manufacturer using Gen X as a "surfactant necessary for making PTFE" in a North Carolina plant. The plant "has discharged toxic Gen X into the local river for decades. It has contaminated residents' drinking water."

- The same manufacturer uses PTFE to produce Teflon™ in a West Virginia factory. "The area [around the factory]'s water is now contaminated with Gen X…."

- A company that "purchases PTFE mixtures" for its Connecticut plant "is a serial polluter of water."

[67] The Ecology Center, *supra* note 53.
[68] *Id.*

### A. Consumers Do Not Expect Products with Environmental Representations to Contain Unsustainable Chemicals.

107. Consumers, such as Plaintiff Dalewitz, do not expect PFAS in products made by companies which claim to prioritize environmental sustainability.

108. In fact, concern about PFAS and the environment go hand-in-hand as "[n]early 70% of adults who say they are 'very concerned' about PFAS are also very concerned about climate change."[69]

109. By advertising that it is a sustainably focused company, P&G misleads consumers into thinking that its Products would not be made with environmentally damaging PFAS.

## VI. P&G Has a Duty to Warn Consumers About the Presence of PFAS in The Products.

110. Reasonable consumers encountering the Products would not expect the presence of PFAS, which are known to be persistent in the environment and linked with health issues, such as high cholesterol, thyroid disease, pregnancy-induced hypertension, and kidney and testicular cancer.[70]

111. P&G does not disclose on the Products' packaging that it contains PFAS chemicals.[71]

112. Rather, consumers would need to do extensive research on the manufacturing history of Oral-B Glide, which is an unreasonable burden to place on consumers.

113. When asked about the results of the Boronow Study[72] that found a correlation between PFAS levels and usage of the Products, a representative for P&G responded, "[t]he safety

---

[69] Danielle Commisso, *Consumer Concern Over PFAS 'Forever Chemicals' Continues to Grow*, Civic Science (Aug. 1, 2023), https://civicscience.com/consumer-concern-over-pfas-forever-chemicals-continues-to-grow/.
[70] *See supra* note 55.
[71] *See supra* ¶ 52.
[72] Boronow, *supra* note 63.

of the people who use our products is our top priority. Our dental floss undergoes thorough safety testing and we stand behind the safety of all our products."[73] This statement not only ***does not deny*** the use of PFAS in the Products, but further reinsures consumers that the Products do not contain any unsafe chemicals.

114.     A study on Teflon™, which is the commercial name for PTFE, shows that Teflon™ nanoparticles "have been found to enter cells and eventually even cell nuclei."[74]

115.     In fact, dental floss in particular is known for being an "effective way" to "deliver" substances into the mouths of users.[75]

116.     Also, dental floss "is prone to shredding. When dental floss shreds, it leaves particles or pieces behind…."[76]

117.     Additionally, PFAS are known to be one of the most mobile classes of chemicals.[77]

118.     Moreover, PFAS "studies have shown that ingestion is the primary route of exposure."[78]

119.     Furthermore, 3M, a major PFAS manufacturer, has known that PFAS can cause "acute oral toxicity" since 1966.[79]

[73] Ryan W. Miller, *Oral-B Glide floss tied to potentially toxic PFAS chemicals, study suggests*, USA Today (Jan. 10, 2019), https://www.usatoday.com/story/news/nation/2019/01/09/oral-b-glide-floss-toxic-pfas-chemicals-study/2530661002/.

[74] Rainer Lohmann, et al., *Are Fluoropolymers Really of Low Concern for Human and Environmental Health and Separate from Other PFAS?*, 54 Envtl. Sci. Tech., 12820–12828 (2020), https://doi.org/10.1021/acs.est.0c03244.

[75] Nataliya Babayevska, et al., *Novel nanosystems to enhance biological activity of hydroxyapatite against dental caries*, 124 Materials Science and Engineering: C 112062 (2021), https://doi.org/10.1016/j.msec.2021.112062. (Study used Oral-B floss products, including those made with PTFE).

[76] Adrian K. Stavrakis, et al., *Performance Evaluation of Dental Flosses Pre- and Post-Utilization*, 15(4) Materials (Basel, Switzerland) 1522 (2022), doi: 10.3390/ma15041522. (Finding that while Oral-B branded dental floss may be stronger than other flosses, it is still prone to breakage).

[77] Heidelore Fiedler, et al., *A Critical Review of a Recommended Analytical and Classification Approach for Organic Fluorinated Compounds with an Emphasis on Per- and Polyfluoroalkyl Substances*, 17 Integrated Envtl. Assessment and Mgmt. 331 (2020), https://doi.org/10.1002/ieam.4352.

[78] Andrew D. Monnot, et al., *Can oral toxicity data for PFAS inform on toxicity via inhalation?*, 43(8) Risk Analysis 1533-1538 (2022), https://doi.org/10.1111/risa.14039.

[79] Jared Hayes, *For decades, polluters knew PFAS chemicals were dangerous but hid risks from public*, Envtl. Working Group (Aug. 29, 2019), https://www.ewg.org/research/decades-polluters-knew-pfas-chemicals-were-dangerous-hid-risks-public.

120.    Given that consumers run Oral-B Glide in between their teeth and gums, there is a substantial risk to consumers of oral absorption/ingestion of the Products' PFAS ingredients.

121.    Upon information and belief, the PFAS within the Products migrate from the Product into the user's body via oral absorption/ingestion and contribute to the user's overall body burden of PFAS.

122.    PFAS are known to bioaccumulate and to cause numerous health impacts.

123.    No reasonable consumer would expect that a Product marketed for one's health would contain dangerous PFAS, which are indisputably linked to harmful health effects in humans. Reasonable consumers would also not expect a company touting its commitment to product safety to use objectively unsafe chemicals as product ingredients. Accordingly, Plaintiff Dalewitz and Class Members suffered economic injuries as a result of purchasing the Product.

124.    As the Products expose consumers to PFAS that are detrimental to consumers' health, the Products are not fit for consumption by humans.

125.    Since these facts relate to a critical safety-related deficiency in the Products, Defendant P&G was under a continuous duty to disclose to Plaintiff Dalewitz and Class Members the true standard, quality, and grade of the Products and to disclose that the Products contained substances known to have adverse health effects. Nonetheless, P&G concealed and affirmatively misrepresented the Product, as discussed herein.

126.    To this day, Defendant P&G continues to conceal and suppress the true nature, identity, source, and method of production of the Products.

127.    P&G's concealment tolls the applicable statute of limitations.

128.    Consumers are at risk of real, immediate, and continuing harm if the Products continue to be sold as is, without curing the deceptive representations and omissions.

129.     P&G has failed to provide adequate relief to purchasers as of the filing of this Complaint.

130.     P&G's "Pro-Health" representation has conveyed a series of express and implied claims and/or omissions that it knows are material to the reasonable consumer in making purchasing decisions, and that Defendant intended for consumers to rely upon when choosing to purchase the Product.

131.     Had P&G not made the false, misleading, and deceptive representation, Plaintiff Dalewitz and the Class Members would not have been willing to pay the same amount for the Products they purchased and/or would not have been willing to purchase the Products at all, or to purchase as many of the Products.

132.     Upon information and belief, Defendant P&G has profited enormously from the falsely and deceptively marketed Product.

## JURISDICTION AND VENUE

133.     This Court has personal jurisdiction over the Parties in this case.

134.     Defendant P&G is incorporated in Delaware and headquartered in Ohio.

135.     Defendant regularly conducts and transacts business in New York, purposefully avails itself of the laws of New York, markets the Products to consumers in New York, and sells the Products throughout New York. Plaintiff Dalewitz purchased the Products in New York State.

136.     Plaintiff Dalewitz is a citizen of New York and consents to this Court's jurisdiction.

137.     This Court has original subject-matter jurisdiction over this proposed class action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), which provides for the original jurisdiction of the federal courts in any class action in which the proposed plaintiff class comprises at least 100 members, any member of the plaintiff class is a citizen of a state different from any

defendant, and the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs. Plaintiff Dalewitz alleges that the total claims of individual members of the proposed Class (as defined herein) exceed $5,000,000 in the aggregate, exclusive of interest and costs.

138.    Venue is proper in this District under 28 U.S.C. § 1391(a). Substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information regarding the nature and quality of the Products, occurred within this District.

## CLASS ALLEGATIONS

139.    Plaintiff Dalewitz brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all other similarly situated individuals nationwide (the "Class"), defined as follows:

> All consumers who purchased the Products within the United States during the applicable statute of limitations period (the "Class Period") and until the date of class certification.

140.    Included in the Class, to the extent necessary, is a subclass of all persons who purchased the Products (as defined herein) in New York during the Class Period (the "New York Subclass").

141.    Excluded from the Class are (1) Defendant, any entity or division in which Defendant has a controlling interest, and Defendant's legal representatives, officers, directors, assigns, and successors; and (2) the judge to whom this case is assigned and the judge's staff.

142.    Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a)  Whether Defendant is responsible for the advertising at issue;

b)  Whether the advertising of the Products was unfair, false, deceptive, fraudulent, and/or unlawful;

c) Whether Defendant breached a warranty created through the marketing of its Product; and

d) Whether Defendant's conduct as set forth above injured Plaintiff Dalewitz and Class Members.

143.   Plaintiff Dalewitz's claims are typical of the claims of the Class in that he was exposed to Defendant's false and misleading marketing and promotional materials and representations, purchased the Product, and suffered a loss as a result of those purchases.

144.   The precise number of the Class Members and their identities are unknown to Plaintiff Dalewitz at this time but may be determined through discovery.

145.   Plaintiff Dalewitz is an adequate representative of the Class because his interests do not conflict with the interests of the Class Members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions involving false advertising, and he intends to prosecute this action vigorously.

146.   The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. A class action provides a fair and efficient method, if not the only method, for adjudicating this controversy and avoids the potential for inconsistent or contradictory judgments. The substantive claims of Plaintiff Dalewitz and the Class are nearly identical and will require evidentiary proof of the same kind and application of the same laws. There is no plain, speedy, or adequate remedy other than by maintenance of this class action.

147.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because Class Members number in the thousands and individual

joinder is impracticable. The expense and burden of individual litigation would make it impracticable or impossible for proposed Class Members to prosecute their claims individually, and the disposition of this case as part of a single class action lawsuit will benefit the parties and greatly reduce the aggregate judicial resources that would be spent if this matter were handled as hundreds or thousands of separate lawsuits. Trial of Plaintiff Dalewitz's and the Class Members' claims together is manageable. Unless the Class is certified, Defendant P&G will remain free to continue to engage in the wrongful conduct alleged herein without consequence.

148.    No member of the Class has a substantial interest in individually controlling the prosecution of a separate action.

149.    The prerequisites to maintaining a class action for equitable relief are met. By representing that the Products sold by Defendant are "Pro-Health" and by omitting the significant risk of PFAS exposure, Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final equitable and monetary relief with respect to the Class as a whole.

150.    The prerequisites to maintaining a class action for equitable relief are also met by Defendant's environmental representations, which fail to disclose the use of unsustainable PFAS in the Products, which Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final equitable and monetary relief with respect to the Class as a whole.

151.    The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant. Additionally, individual actions could be dispositive of the interests of the Class even where certain Class Members are not parties to such actions.

152.     Defendant P&G's conduct is generally applicable to the Class as a whole, and Plaintiff Dalewitz seeks, *inter alia*, equitable remedies with respect to the Class as a whole.

153.     Plaintiff Dalewitz knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance of a class action.

## CAUSES OF ACTION

### COUNT I
### *Violations of the New York General Business Law § 349*
### (On Behalf of Plaintiff Dalewitz and the New York Subclass)

154.     Plaintiff Dalewitz realleges and incorporates herein by reference all preceding paragraphs of this Complaint as though set forth and at length herein.

155.     The acts of Defendant P&G, as described above, and each of them, constitute unlawful, deceptive, and fraudulent business acts and practices.

156.     Defendant markets the Products as conferring health benefits, when testing has shown the likely presence of PFAS, which have a negative impact on human health.

157.     Defendant also makes environmental and product safety claims, which are false due to its use of PFAS to make the Products.

158.     Defendant has violated, and continues to violate, § 349 of the New York General Business Law ("NYGBL"), which makes deceptive acts and practices unlawful. As a direct and proximate result of Defendant's violation of § 349, Plaintiff Dalewitz and other members of the New York Subclass have suffered damages in an amount to be determined at trial.

159.     Defendant's improper consumer-oriented conduct is misleading in a material way in that it, *inter alia*, induced Plaintiff Dalewitz and the New York Subclass Members to purchase and to pay the requested price for the Products when they otherwise would not have, or would not have purchased as much.

160. Defendant made the untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

161. Plaintiff Dalewitz and the New York Subclass Members have been injured by their purchase of the Product, which was worth less than what they bargained and/or paid for, and which they selected over other products that may have been truthfully marketed.

162. Defendant's advertising induced Plaintiff Dalewitz and the New York Subclass Members to buy the Product, to buy more of them, and/or to pay the price requested.

163. As a direct and proximate result of Defendant P&G's violation of § 349, Plaintiff Dalewitz and other members of the New York Subclass paid for the falsely advertised Products and, as such, have suffered damages in an amount to be determined at trial.

164. By reason of the foregoing, Plaintiff Dalewitz and the New York Subclass Members are entitled to (1) actual damages and/or statutory damages; (2) punitive damages; and (3) reasonable attorneys' fees, pursuant to NYGBL § 349(h).

**COUNT II**
***Violations of the New York General Business Law § 350***
**(On Behalf of Plaintiff Dalewitz and the New York Subclass)**

165. Plaintiff Dalewitz realleges and incorporates herein by reference all preceding paragraphs of this Complaint as though set forth and at length herein.

166. The acts of Defendant, as described above, and each of them, constitute unlawful, deceptive, and fraudulent business acts and practices.

167. New York General Business Law § 350 provides: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

168.    NYGBL § 350-a defines "false advertising," in relevant part, as "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect."

169.    Plaintiff Dalewitz and the members of the New York Subclass are consumers who purchased Defendant's Products in New York.

170.    As a seller of goods to the consuming public, Defendant P&G is engaged in the conduct of business, trade, or commerce within the intended ambit of § 350.

171.    Defendant's representations (made by statement, word, design, device, sound, or any combination thereof), and also the extent to which Defendant's advertising has failed to reveal material facts with respect to its Product, as described above, have constituted false advertising in violation of § 350.

172.    Defendant's false advertising was knowing and intentional, as the Products' main ingredient is ePTFE, a type of PFAS.[80]

173.    Defendant's actions led to direct, foreseeable, and proximate injury to Plaintiff Dalewitz and the members of the New York Subclass.

174.    As a consequence of Defendant's deceptive marketing scheme, Plaintiff Dalewitz and the other members of the New York Subclass suffered an ascertainable loss, insofar as they would not have purchased the Products had the truth been known, would not have paid the requested price for the Products and/or would have purchased less of the Products; moreover, as a result of Defendant's conduct, Plaintiff Dalewitz and the other members of the New York Subclass received products of less value than what they paid for.

---

[80] Considering PTFE requires the use of other PFAS, discovery may reveal more PFAS chemicals are in the Products.

175.     By reason of the foregoing, Plaintiff Dalewitz and the New York Subclass Members are entitled to (1) actual damages and/or statutory damages; (2) punitive damages; and (3) reasonable attorneys' fees, pursuant to NYGBL § 350-e(3).

**COUNT III**
***Fraudulent Concealment***
**(On Behalf of Plaintiff Dalewitz and All Class Members)**

176.     Plaintiff Dalewitz realleges and reincorporates by reference all paragraphs alleged above.

177.     Plaintiff Dalewitz brings this claim individually and on behalf of the Class.

178.     At the time Plaintiff and Class Members purchased the Product, Defendant P&G did not disclose the fact that the Products are made with PFAS chemicals.

179.     Defendant affirmatively misrepresented the Products as a safe and healthy dental hygiene product.

180.     Defendant affirmatively misrepresented that it is an environmentally conscious company and that the products it sells, including the Products, are sustainable.

181.     Defendant P&G also knew that its omissions and misrepresentations regarding the Products were material, and that a reasonable consumer would rely upon Defendant's representations (and corresponding omissions) in making purchasing decisions.

182.     Plaintiff Dalewitz and Class Members did not know—nor could they have known through reasonable diligence—about the true nature of the Products since the ingredients are not disclosed on the packaging. Further, P&G's website, while containing references to PTFE, does not clarify the true ingredients found in the Products.

183.     Plaintiff Dalewitz and Class Members were reasonable in relying on Defendant P&G's misrepresentations (and corresponding omissions) in making their purchasing decisions.

184.    Plaintiff Dalewitz and Class Members had a right to reply upon P&G's representations (and corresponding omissions), as only Defendant knows the truth about how the Products are manufactured.

185.    Plaintiff Dalewitz and Class Members sustained damages as a result of their reliance on Defendant P&G's omissions and misrepresentations, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Dalewitz respectfully requests that the Court enter judgment in his favor and in favor of the Class as follows:

A.    An order certifying the proposed Class and Subclass; appointing Plaintiff Dalewitz as representative of the Class and Subclass; and appointing Plaintiff Dalewitz's undersigned counsel as class counsel for the Class and Subclass;

B.    An order declaring that Defendant is financially responsible for notifying Class Members of the pendency of this suit;

C.    An order declaring that Defendant P&G's conduct violates the statutes referenced herein;

D.    An order awarding monetary damages, including actual damages, statutory damages, and punitive damages, in the maximum amount provided by law under the statutes named herein;

E.    An order awarding compensation for breach of warranty;

F.    An order for prejudgment interest on all amounts awarded;

G.    An order awarding Plaintiff Dalewitz and the other Class Members the reasonable costs and expenses of suit, including their attorneys' fees; and

H.   Any further relief that the Court may deem appropriate.

## **JURY TRIAL DEMANDED**

186.   Plaintiff Dalewitz hereby demands a trial by jury.

DATED: November 13, 2023

**RICHMAN LAW & POLICY**

_____
Kim E. Richman
1 Bridge Street, Suite 83
Irvington, NY 10533
T: (914) 693-2018
krichman@richmanlawpolicy.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn
Alec M. Leslie
888 7th Avenue
New York, New York 10019
T: (646) 837-7150
jarisohn@bursor.com
aleslie@bursor.com

*Attorneys for Plaintiff*