```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/09/2026
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALAN DALEWITZ, on behalf of himself and all others similarly situated,

                          Plaintiff,

   -against-

THE PROCTER & GAMBLE COMPANY,

                          Defendant.

No. 22-CV-07323 (NSR)

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge:

    Plaintiff Alan Dalewitz ("Plaintiff"), individually and on behalf of others similarly situated, brings this putative class action against the Procter & Gamble Company ("P&G"), alleging deceptive and false advertising practices in violation of New York General Business Law §§ 349 and 350. Plaintiff specifically alleges that certain P&G dental floss products are misleadingly branded as "Pro-Health" despite containing per-and polyfluoroalkyl substances ("PFAS"), a group of chemicals known to be harmful to humans and the environment. Pending before the Court is P&G's motion to dismiss the Second Amended Complaint ("SAC") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (ECF No. 35.)

    For the following reasons, P&G's motion to dismiss is GRANTED.

## BACKGROUND

    The following facts are drawn from the SAC and are assumed as true for purposes of this motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### I. PFAS and Their Effects on Human Health and the Environment

    PFAS is a group of synthetic chemicals. (SAC ¶ 2.) As of today, the PFAS chemical family contains more than 9,000 highly fluorinated aliphatic compounds—all manufactured by humans

1

and known to be harmful to both human health and the environment. (*Id*. ¶ 33.) For instance, human consumption of PFAS have been linked to several ailments, including high cholesterol, thyroid disease, pregnancy-induced hypertension, and kidney and testicular cancer. (*Id*. ¶ 110.) PFAS are also known as "forever chemicals" because they are non-biodegradable. (*Id*. ¶ 100.) Despite being termed as a "hazardous substance," PFAS continue to find their way into products used by consumers on a daily basis. (*Id*. ¶¶ 58–59.)

The continued production and use of PFAS has made consumers increasingly aware of, and concerned about, PFAS and their presence in the human body, the environment, and consumer products. (*Id*. ¶ 35.) To demonstrate this point, Plaintiff conducted his own survey discovering that 95.1% of survey respondents indicated that the presence of PFAS in products—including dental floss—would be either important or very important to their purchasing decisions. (*Id*. ¶ 97.) Several other surveys similarly demonstrate the importance of health to consumers when deciding which products to purchase. (*Id*. ¶¶ 62–64.)

II.     **P&G's Oral-B Glide Products and PFAS Testing Results**

P&G is "the world's largest consumer goods company" and has owned the "Oral-B" brand for almost 20 years. (*Id*. ¶¶ 23–24.) Oral-B is a brand of dental hygiene products marketed to emphasize the importance of oral health. (*Id*. ¶ 9.) Relevant here, the Oral-B brand includes the "Oral-B Glide," which is a line of dental floss products. (*Id*.) The Oral-B brand is generally advertised as being "Pro-Health" and is aimed at consumers willing to pay more for products that tout health benefits, as opposed to flavor or cosmetic appeal. (*Id*.) For instance, P&G distributes its Oral-B Glide products with the phrase "Pro Health Advanced" on the casing of the product. (*Id*. ¶ 55.) Oral-B Glide products also cost more than generic brands of dental floss. (*Id*. ¶ 52.) P&G similarly advertises that "environmental sustainability is embedded in how [they] do

business."  (*Id*. ¶ 67.)  P&G specifically represents to consumers that its sustainably plans are "built upon the strength of four science-based pillars—Climate, Waste, Water and Nature."  (*Id*. ¶ 68.)

Despite P&G's representation that its products promote health and environmental sustainability, Plaintiff alleges that many of P&G's products, including Oral-B Glide products, contain traces of PFAS.  (*Id*. § IV.)  Plaintiff first alleges that Oral-B Glide products are made with expanded polytetrafluoroethylene ("ePTFE"), which is a type of polytetrafluoroethylene ("PTFE").  (*Id*. ¶ 42.)  PTFE is typically made using several PFAS.  (*Id*. ¶ 43.)  Given that PTFE is made with PFAS, studies have begun to question whether PTFE is safe for human consumption.  (*Id*. ¶ 44.)  However, as Plaintiff points out, P&G discloses on its website that some of its Oral-B Glide products contain PTFE.  (*Id*. ¶ 74.)

Plaintiff next alleges that he commissioned Galbraith Laboratories, Inc. ("Galbraith Laboratories"), an independent third party, to conduct "Total Organic Fluorine" ("TOF") testing to determine whether any additional PFAS were present in Oral-B Glide products in May 2022.  (SAC ¶ 75; ECF No. 17, "FAC," ¶ 75.)  Galbraith Laboratories is located in Knoxville, Tennessee.  (FAC ¶ 75.)  Although Plaintiff does not explain the testing process in the SAC, the First Amended Complaint alleges that, since "the world hasn't found a way to test which of 9,000 PFAS are in products, the best current test methods [for PFAS] look for fluorine."  (FAC ¶ 78.)  Experts in PFAS appear to agree that the presence of organic fluorine is a reliable proxy for the presence of PFAS in a product.  (*Id*. ¶ 80.)  Plaintiff specifically tested the "Oral-B Glide Advanced Multi-Protection Floss Clean Mint" product.  (*Id*. ¶ 75.)  As a result of conducting this test, Plaintiff concluded that Oral-B Glide products contain 302,400 parts per million ("ppm") of organic

3

fluorine. (SAC ¶ 76.) According to Plaintiff, that level is more than 3000 times the 100 ppm of organic fluorine that is widely accepted as being indicative of intentional use of PFAS. (*Id.*)

Plaintiff similarly alleges that he commissioned Eurofins Product Testing USA ("Eurofins"), another independent third party, to conduct an "EPA 537 Isotope Dilution" test of the "Oral-B Glide Advanced Multi-Protection Floss Clean Mint" product, which was conducted from November 1, 2023, to December 11, 2023. (*Id.* ¶ 77.) Eurofins is located in Bothell, Washington. (*Id.*) As a result of conducting this test, Plaintiff identified four additional PFAS in the Oral-B Glide product, including: (1) 51.7 parts per billion ("ppb") of perfluoromethoxypropionic acid ("PMPA"); (2) 0.948 ppb of N-methyl perfluorooctanesulfonamido ethanol ("NMeFOSE"); (3) 6.86 ppb of perfluorobutanoic acid ("PFBA"); and (4) 2.8 ppb of perfluoropropanesulfonic acid ("PFPS"). (*Id.* ¶ 78.) Unlike PTFE, however, none of these PFAS are disclosed by P&G on its website. (*Id.*)

### III. Plaintiff's Purchase and Use of Oral-B Glide Products

Plaintiff is an individual consumer of P&G products, including Oral-B Glide products. (*Id.* ¶ 16.) During the putative Class Period, Plaintiff purchased Oral-B Glide products approximately every six months in multi-pack quantities at Costco Wholesale in Nanuet, New York. (*Id.* ¶ 17.) Plaintiff alleges that he was encouraged to purchase Oral-B Glide products because of the "Pro-Health" slogan printed on P&G's packaging. (*Id.* ¶ 18.) Plaintiff also purchased Oral-B Glide products because of P&G's commitments to protecting the environment. (*Id.*) Plaintiff alleges that he would not have purchased Oral-B Glide products, or paid a premium for them, had he known they contained dangerous and unsustainable PFAS. (*Id.* ¶¶ 21–22.)

## PROCEDURAL HISTORY

Plaintiff commenced this action on August 26, 2022. (ECF No. 1.) The Court dismissed Plaintiff's initial Complaint, without prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(6) on September 22, 2023. (ECF No. 14.) Plaintiff thereafter filed the First Amended Complaint on November 13, 2023. (ECF No. 17.) The Court subsequently permitted Plaintiff to file a Second Amended Complaint, which was filed on March 19, 2025. (ECF Nos. 28–29.) P&G moved to dismiss the Second Amended Complaint on July 1, 2025. (ECF No. 35.) Plaintiff opposed the motion. (ECF No. 37.) P&G filed a reply memorandum in further support of its motion. (ECF No. 38.) On December 11, 2025, P&G informed the Court of applicable supplemental authority, (ECF No. 39), and Plaintiff submitted a response to that supplemental authority on December 15, 2025, (ECF No. 40).

## LEGAL STANDARD

### I. Federal Rule of Civil Procedure 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), "[a] case is properly dismissed for lack of subject matter jurisdiction… when the district court lacks the statutory or constitutional power to adjudicate it." *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 94 (2d Cir. 2011) (citation and internal quotations omitted). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). In assessing whether there is subject matter jurisdiction, the Court must accept as true all material facts alleged in the complaint. *Conyers v. Rossides*, 558 F.3d 137, 143 (2d Cir. 2009). Without jurisdiction, the Court is devoid of the "power to adjudicate the merits of the case," and for that reason, a court must decide a Fed. R. Civ. P. 12(b)(1) motion before any motion on the merits. *Carter v. HealthPort Tech., LLC*, 822 F.3d 47, 55 (2d Cir. 2016).

## II. Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. While the Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555).

The Second Circuit "deem[s] a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference… and documents that plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rotham v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (internal citations omitted). The critical inquiry is whether a plaintiff has pled sufficient facts to nudge their claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. A motion to dismiss will be denied where the allegations "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## DISCUSSION

Plaintiff asserts claims under New York General Business Law §§ 349 and 350 against P&G for allegedly misleading consumers about the health and environmental qualities of its Oral-B Glide products. (*See* SAC ¶¶ 147, 158.) In response, P&G contends that the SAC's dismissal is warranted on the grounds that Plaintiff (1) lacks standing for failure to adequately plead an

6

economic injury; (2) fails to allege that the presence of PFAS in Oral-B Glide products resulted in bodily harm; (3) fails to allege that Oral-B Glide products serve as a source of PFAS exposure; (4) fails to allege that P&G engaged in deceptive or materially misleading practices; and (5) fails to allege that P&G's use of PFAS resulted in environmental harm.  (*See generally* ECF No. 36, "Def. Mot.")  The Court now addresses each claim in turn.

I. **Article III Standing**

P&G first argues that the SAC's dismissal is warranted because Plaintiff fails to plead an economic injury and therefore lacks standing.  (Def. Mot. at 6.)  P&G specifically contends that Plaintiff has not suffered an economic injury because he (1) fails to plead that the Oral-B Glide products he purchased contained PFAS and (2) fails to demonstrate a causal connection between his alleged injury and the challenged advertisements that Oral-B Glide products are "Pro-Health." (*Id*. at 6–12.)

To demonstrate Article III standing, a plaintiff must establish (1) an injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) redressability of the injury by a "favorable decision."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  To establish injury in fact, a plaintiff must show that he suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  *Id*. at 560 (internal quotations omitted).  In the class action context, a plaintiff, as the party invoking federal jurisdiction, "bear[s] the burden of demonstrating that [he has] standing."  *Hicks v. L'Oreal U.S.A.*, Inc. ("Hicks II"), 2024 WL 4252498, at *8 (S.D.N.Y. Sept. 19, 2024) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430 (2021)).  The named class plaintiff "must [also] allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport

7

to represent." *Warth v. Seldin*, 422 U.S. 490, 502 (1975).  When a plaintiff alleges an economic injury, he might demonstrate such an injury through a price-premium or benefit-of-the-bargain theory.  *See In re Beech-Nut Nutrition Co. Baby Food Litig.*, 771 F. Supp. 3d 96, 103 (N.D.N.Y. Mar. 19, 2025).

In the instant action, Plaintiff alleges that he, along with other consumers, was injured by paying "a price premium based on false or misleading representations," *i.e.*, that Oral-B Glide products are "Pro-Health."  (SAC ¶ 21.)  Plaintiff also alleges that he would not have purchased Oral-B Glide products if he had known that they contained "PFAS, a group of dangerous and unsustainable chemicals."  (*Id*. ¶ 22.)  As Plaintiff appears to invoke both the price-premium and benefit-of-the-bargain theories, the Court addresses each in turn.

### A. Price-Premium Injury

To establish an economic injury under a price-premium theory, a plaintiff must allege that "[they] purchased products bearing allegedly misleading labels and sustained financial injury—paying a premium—as a result."  *Axon v. Florida's Natural Growers, Inc.*, 813 F. App'x 701, 703–04 (2d Cir. 2020).  More specifically, Plaintiff must plead that he "either purchased adulterated products or that PFAS was so widespread that it was plausible that either specific product lines or all of the defendant's products contained PFAS."  *Lurenz v. Coca-Cola Co.*, 2025 WL 2773188, at *4 (S.D.N.Y. Sept. 29, 2025).

#### i. Whether Plaintiff Purchased Oral-B Glide Products Containing PFAS

When a plaintiff relies on testing to support allegations of misbranding, such as here, "[t]he most direct route would be for Plaintiff[ ] to test [his] own purchases for PFAS."  *Onaka v. Shiseido Ams. Corp.* ("Onaka II"), 2024 WL 1177976, at *2 (S.D.N.Y. Mar. 19, 2024).

Plaintiff first alleges that he commissioned Galbraith Laboratories to conduct TOF testing on the "Oral-B Glide Advanced Multi-Protection Floss Clean Mint" product in May 2022. (FAC ¶ 75.) The testing results indicated that the Oral-B Glide product contained 302,400 ppm of organic fluorine, a level that is more than 3,000 times the 100 ppm of organic fluorine that is widely accepted as being indicative of the intentional use of PFAS. (*Id.* ¶ 76.) Plaintiff also alleges that he commissioned Eurofins to conduct "EPA 537 Isotope Dilution" testing on the same Oral-B Glide product between November 1, 2023, and December 11, 2023. (SAC ¶ 78.) The testing results similarly indicated that the Oral-B Glide product contained four strains of PFAS—PMPA, NMeFOSE, PFBA, and PFPS—at various levels. (*Id.*) As a result of these tests, Plaintiff ultimately concludes that Oral-B Glide products are not "Pro-Health." (*Id.* ¶ 79.)

While the SAC identifies which specific Oral-B Glide product was tested by Galbraith Laboratories and Eurofins, it does not clarify whether the samples tested came from an actual Oral-B Glide product purchased by Plaintiff or from unpurchased products within P&G's product line. Indeed, nowhere in the SAC does Plaintiff allege that he purchased the Oral-B Glide products that were tested. (*See generally* SAC.) Plaintiff only alleges that he tested a specific Oral-B Glide product; not whether it was an actual item he purchased during the putative Class Period. (*Id.* ¶ 77.) As such, the Court cannot determine whether Plaintiff "purchased a [p]roduct that was misbranded, *i.e.*, that contained PFAS… because the samples plausibly could have been PFAS-free when collected and contaminated with PFAS long after collection through no fault of Defendant[ ]." *Lurenz*, 2025 WL 2773188, at *4.

The SAC also fails to aver detailed facts supporting the testing performed by Galbraith Laboratories and Eurofins. The Court acknowledges that, with respect to the TOF testing conducted by Galbraith Laboratories, Plaintiff does describe the specifics of the testing performed.

9

(*See* FAC ¶¶ 75–78.) That description, however, was not in the SAC—which is the operative complaint. (*See* SAC ¶¶ 75–76.) Concerning the testing performed by Eurofins, Plaintiff does not explain or describe what an "EPA 537 Isotope Dilution" test is or how it detects potential PFAS. (*See* SAC ¶ 77.) Nevertheless, both third-party tests suffer from the same deficiencies: Plaintiff does not clarify, among other things, whether the samples tested were taken from products Plaintiff actually purchased; when the samples were collected; how many samples were collected and tested for each product line; or whether all tested samples yielded positive results for PFAS. *See Lurenz*, 2025 WL 2773188, at *5; *see also Hicks v. L'Oreal U.S.A., Inc.* ("*Hicks I*"), 2023 WL 6386847, at *8 (S.D.N.Y. Sept. 30, 2023) (finding that plaintiffs had not adequately pleaded that the products they purchased contained PFAS because "[t]he Amended Complaint [did] not allege, for instance, how many products were tested in Plaintiffs' Study, whether all those tested products revealed the presence of PFAS, and if not, what percentage of the products had PFAS").

As a result, the Court concludes that the SAC does not adequately plead whether Plaintiff purchased Oral-B Glide products with PFAS because it is unclear whether he tested the products he actually purchased during the putative Class Period.

> **ii. Whether Plaintiff Demonstrates a Material Link Between His Purchases and the Independent Testing**

Given that Plaintiff does not plausibly allege that he purchased products containing PFAS—the most direct route to establish Article III standing under the price-premium theory—he may still attempt to allege the presence of PFAS by "sufficiently link[ing] the results of independent testing of the same product line to the product actually purchased." *Hicks II*, 2024 WL 4252498, at *9.

Courts generally consider several factors to determine whether a meaningful link exists between testing results and a plaintiff's actual purchases to support a plausible inference of injury.

First, and perhaps most important, a plaintiff must show that testing occurred "reasonably near in time" to their purchases. *Onaka II*, 2024 WL 1177976, at *3. Second, courts examine whether a plaintiff "regularly purchased" the product and whether the complaint alleges that the product was "systematically and routinely mislabeled." *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 735–37 (2d Cir. 2017). Third, courts consider "the number of samples tested, and the testing should involve more than a small number" and, where relevant, "geographic proximity of the testing to the plaintiff's purchases." *Hicks II*, 2024 WL 4252498, at *10 (collecting cases); *see also Dunning v. Supergoop, LLC*, 2025 WL 34822, at *5 (S.D.N.Y. Jan. 6, 2025).

Other than alleging that he regularly purchased Oral-B Glide products approximately every six months during the putative Class Period, (*see* SAC ¶ 17), Plaintiff fails to sufficiently link the results of his third-party tests to the products he purchased.[1] The SAC is unclear as to the timeline of Plaintiff's purchases in relation to when the third-party testing was conducted. (*Id.* ¶¶ 75–78.) As explained above, Plaintiff conducted two separate experiments: (1) TOF testing in May 2022, and (2) EPA 537 Isotope Dilution testing between November 1, 2023, and December 11, 2023. (FAC ¶ 75; SAC ¶ 77.) For the TOF testing conducted in May 2022, the SAC does not specify when the samples were collected or whether they came from products that Plaintiff actually purchased around the time of testing. (FAC ¶ 75.) Nor does the SAC specify this for the EPA 537 Isotope Dilution testing. (SAC ¶ 77.) Plaintiff also concedes that he ceased purchasing Oral-B Glide products after discovering that they potentially contained PFAS, or at some point after

---

[1] Although Plaintiff alleges that he purchased Oral-B Glide products every six months during the putative Class Period, he nevertheless fails to demonstrate temporal proximity between his alleged purchases and the testing. As explained above, Plaintiff's third-party testing provides insufficient detail regarding the methodology and results to establish widespread contamination of Oral-B Glide products. As a result, Plaintiff does not adequately allege that "the presence of PFAS in the products is so widespread as to render it plausible that… Plaintiff purchased a mislabeled product at least once." *Onaka v. Shiseido Americas Corp.* ("*Onaka I*"), 2023 WL 2663877, at *5 (S.D.N.Y. Mar. 28, 2023).

commencing this action.[2] (Pl. Opp. at 17.) If Plaintiff discovered in May 2022 that Oral-B Glide products potentially contained PFAS, then more than a year elapsed between his last purchase and the second round of testing conducted in November 2023, further undermining any plausible link between the tested products and his purchases. *See Onaka II*, 2024 WL 1177976, at *3 (finding no injury where the complaint failed to specify "when exactly [Plaintiff] purchased each particular [product]" even though purchase allegedly occurred "in September 2021" and testing took place in "September or October of 2021").

Plaintiff likewise fails to allege sufficient facts regarding both the number of Oral-B Glide samples tested and the geographic proximity of those samples. As explained above, the SAC only states that Plaintiff tested the "Oral-B Glide Advanced Multi-Protection Floss Clean Mint" product and provides no further details. (SAC ¶ 77.) It does not indicate how many of these products were actually tested for PFAS contamination. With respect to geographic proximity, although Plaintiff alleges that he purchased Oral-B Glide products for his personal use in Nanuet, New York, neither Galbraith Laboratories nor Eurofins is located in New York. (*See* FAC ¶ 75; SAC ¶¶ 17, 77.) Galbraith Laboratories is located in Knoxville, Tennessee, while Eurofins is located in Bothell, Washington. (FAC ¶ 75; SAC ¶ 77.) As pleaded, it is unclear whether the Oral-B Glide samples tested were purchased in New York at all. Plaintiff fails to provide any identifying information—such as SKU numbers or lot codes—that would indicate where the tested products were purchased or obtained. In other words, even if Plaintiff purchased Oral-B Glide products for his own use in

---

[2] P&G also argues that, despite conducting testing of Oral-B Glide products, Plaintiff continued to purchase those products "during" the putative Class Period. (Def. Mot. at 4.) Although Plaintiff contends that he did not purchase Oral-B Glide products after commencing this action, (*see* ECF No. 37, "Pl. Opp.," at 17), the SAC, as pleaded, suggests that Plaintiff may have purchased these products after potentially discovering that they contained PFAS. If so, Plaintiff may not establish injury for standing purposes based on a self-inflicted injury because he could have not possibly been misled or deceived by the challenged advertisements. *See Nat. Res. Def. Council Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 85 (2d Cir. 2013) (internal quotation marks omitted). As P&G points out, there is no difference between the phrases "***during*** the Class Period" and "***throughout*** the Class Period." (*See* ECF No. 38, "Def. Reply," at 2–3.)

Nanuet, New York, the samples submitted for testing may have been obtained elsewhere, including from locations geographically distant and closer to Galbraith Laboratories or Eurofins.

Consequently, the Court cannot reasonably infer that Plaintiff purchased misbranded Oral-B Glide products or that PFAS contamination was so widespread as to plausibly affect specific product lines or all of P&G's products as a whole. In the absence of such allegations, "[t]he [Second] Amended Complaint's allegations boil down to describing general and unspecific results of testing," which are insufficient to establish Article III standing for an economic injury under a price-premium theory. *Hicks I*, 2023 WL 6386847, at *9.

### B. Benefit-of-the-Bargain Injury

The Court next examines whether Plaintiff can establish an economic injury under the benefit-of-the-bargain theory. Under this theory, "a plaintiff might successfully plead an economic injury by alleging that [he] bargained for a product worth a given value but received a product worth less than that value." *Barnes v. KOS, Inc.*, 2025 WL 1928027, at *6 (S.D.N.Y. July 14, 2025) (citing *In re Beech-Nut*, 771 F. Supp. 3d at 103). To do so, a plaintiff must identify the specific misrepresentations that induced the purchase. *Id.* However, courts in the Second Circuit have recently applied the more stringent Third Circuit standard when evaluating benefit-of-the-bargain claims. *See, e.g.*, *Lurenz*, 2025 WL 2773188, at *7; *Barnes*, 2025 WL 1928027, at *6; *In re Beech-Nut*, 771 F. Supp. 3d at 103.

For instance, in *Lurenz*, a case involving facts substantially similar to those here, this Court rejected a plaintiff's benefit-of-the-bargain theory as a basis for Article III standing because the plaintiff did not allege an injury that was either concrete or particularized. 2025 WL 2773188, at *4. There, the plaintiff alleged that the defendant branded its fruit juice as "all natural," "made simply with all-natural ingredients," and "naturally delicious." *Id.* at *7. The plaintiff further

13

alleged that such branding was deceptive and misleading because the defendant's fruit juice contained PFAS. *Id.* This Court found, however, that the plaintiff failed to show that the defendant's fruit juice was worth something less than safe and usable fruit juice. *Id.* Indeed, the *Lurenz* plaintiff "paid for fruit juice and received fruit juice, which he consumed without suffering harm, as inferred by the fact that he claims to have suffered only economic injury and does not claim that he or anyone else was harmed by the consumption of the [p]roducts." *Id.* And while the *Lurenz* plaintiff commissioned third-party testing—such as Plaintiff does here—the Court determined that the results were "broad," as they merely alleged that the defendant's fruit juice contained "PFAS in amounts more than 100 times the EPA's recommended levels." *Id.* The Court accordingly determined that the *Lurenz* allegations were pleaded in a "conclusory manner" and did not constitute an injury that was "either concrete or particularized." *Id.*

In the instant action, Plaintiff offers the same conclusory arguments that were dismissed in *Lurenz*. As in *Lurenz*, where the plaintiff alleged that the defendant branded its fruit juice as "all natural," "made simply with all-natural ingredients," and "naturally delicious," 2025 WL 2773188, at *7, Plaintiff alleges that P&G branded Oral-B Glide products as "Pro-Health" and represented that "environmental sustainability is embedded in how [they] do business." (SAC ¶¶ 9, 67.) Plaintiff nevertheless paid for dental floss products and received dental floss products, which he consumed without suffering harm, nor does he claim that others were harmed by the consumption of Oral-B Glide products. (*See generally* SAC.) Plaintiff's TOF testing also broadly claims that the potential PFAS level in the Oral-B Glide sample is "more than 3000 times… that is widely accepted as being indicative of intentional use of PFAS." (SAC ¶ 76.) Plaintiff's EPA 537 Isotope Dilution testing fares no better offering even less information. (*Id.* ¶ 78.) Moreover, Plaintiff's claim that "[n]o reasonable consumer would expect that a [p]roduct marketed for one's health

14

would contain dangerous PFAS," (*Id*. ¶ 121), is unsupported, as he does not identify "cheaper, comparable products to support the notion of a premium," *see In re Beech-Nut*, 771 F. Supp 3d at 106. While Plaintiff does identify a cheaper, generic brand of dental floss products, he fails to identify comparable, **PFAS-free** dental floss products that are cheaper than what he paid for P&G's products. (*Id*. ¶ 52.)

In sum, Plaintiff does not plausibly allege that the Oral-B Glide products were worth less than what he paid for and, therefore, fails to establish a concrete and particularized injury under the price-premium theory of injury. Moreover, because the Court finds that Plaintiff has failed adequately to allege Article III standing, it does not reach the remainder of P&G's arguments for lack of jurisdiction. *See, e.g., Carlone v. Lamont*, 2021 WL 5049455, at *4, n.4 (2d Cir. Nov. 1, 2021) (summary order).

## II. Leave to Amend

The Court must now consider whether to grant Plaintiff leave to amend. Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "[I]t is within the sound discretion of the district court" to deny leave to amend "for good reason," *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 447 (2d Cir. 2019) (quoting *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018)), including "repeated failure to cure deficiencies by amendments previously allowed" or "futility of amendment," *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Still, there is a particularly strong preference for allowing amendment when "the plaintiff has not had the benefit of a court ruling with respect to the deficiencies of its pleading." *Allianz Glob. Invs. GmbH v. Bank of Am. Corp.*, 473 F. Supp. 3d 361, 365 (S.D.N.Y. 2020); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs.*, LLC, 797 F.3d 160, 190 (2d Cir.

15

2015) ("Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies."). Moreover, "where a complaint is dismissed for lack of Article III standing, the dismissal must be without prejudice, rather than with prejudice." *John*, 858 F.3d at 735. The Court thereby grants Plaintiff leave to file a Third Amended Complaint.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant the Procter & Gamble Company's motion to dismiss the Second Amended Complaint without prejudice. The Court also grants Plaintiff Alan Dalewitz leave to file a Third Amended Complaint in accordance with this Order. Plaintiff is advised that the Third Amended Complaint will replace—not supplement—the Second Amended Complaint. If Plaintiff elects to file a Third Amended Complaint, he shall do so no later than February 10, 2026. Should Plaintiff file a Third Amended Complaint, P&G is directed to answer or otherwise respond to the Third Amended Complaint by March 9, 2026. If Plaintiff fails to timely file a Third Amended Complaint, this action will be terminated and dismissed with prejudice.

SO ORDERED.

Dated: January 9, 2026
      White Plains, NY

_____
Nelson S. Román, U.S.D.J.